IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

2023 MAR 13 PM 4:30

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

2:23 CV 0951

JUDGE MARBLEY

MAGISTRATE JUDGE SILVAIN

PEYTON HOPSON
_____
(ENTER ABOVE THE NAME OF THE PLAINTIFF IN THIS ACTION)

IF THE PLAINTIFF IS A PRISONER:    PRISONER # 662-444

vs.

MICHELLE BUMGARDNER
_____
(ENTER ABOVE THE NAME OF THE DEFENDANT IN THIS ACTION)

IF THERE ARE ADDITIONAL DEFENDANTS PLEASE LIST THEM:

_____
_____
_____
_____

**COMPLAINT**

I.   PARTIES TO THE ACTION:

   PLAINTIFF:   PLACE YOUR NAME AND ADDRESS ON THE LINES BELOW. THE ADDRESS YOU GIVE MUST BE THE ADDRESS THAT THE COURT MAY CONTACT YOU AND MAIL DOCUMENTS TO YOU. A TELEPHONE NUMBER IS REQUIRED.

   PEYTON HOPSON #662-444
   NAME - FULL NAME PLEASE - PRINT

   P.O. BOX 540, ST. CLAIRSVILLE, OHIO 43950-0540
   ADDRESS: STREET, CITY, STATE AND ZIP CODE

   (832) 845-3127
   TELEPHONE NUMBER

   IF THERE ARE ADDITIONAL PLAINTIFFS IN THIS SUIT, A SEPARATE PIECE OF PAPER SHOULD BE ATTACHED IMMEDIATELY BEHIND THIS PAGE WITH THEIR FULL NAMES, ADDRESSES AND TELEPHONE NUMBERS. IF NO ADDITIONAL PLAINTIFFS EXIST CONTINUE WITH THIS FORM.

   PAGE 2 AND 3 OF THIS FORM DEAL ONLY WITH A PLAINTIFF THAT IS INCARCERATED AT THE TIME OF FILING THIS COMPLAINT.

-1-

IF YOU ARE A PRISONER FILING A CIVIL SUIT THE FOLLOWING INFORMATION IS REQUIRED:

PREVIOUS LAWSUITS:   SEE ATTACHED

    A.    HAVE YOU BEGUN OTHER LAWSUITS IN STATE OR FEDERAL COURT DEALING WITH THE SAME FACTS INVOLVED IN THIS ACTION OR OTHERWISE RELATING TO YOUR IMPRISONMENT? YES (X) NO ( )

    B.    IF YOUR ANSWER TO A IS YES, DESCRIBE THE LAWSUIT IN THE SPACE BELOW. (IF THERE IS MORE THAN ONE LAWSUIT, DESCRIBE THE ADDITIONAL LAWSUITS ON ANOTHER PIECE OF PAPER, USING THE SAME OUTLINE.)

        1.    PARTIES TO THIS PREVIOUS LAWSUIT

            PLAINTIFFS:

            DEFENDANTS:

        2.    COURT (IF FEDERAL COURT, NAME THE DISTRICT: IF STATE COURT, NAME THE COUNTY)

        3.    DOCKET NUMBER

        4.    NAME OF THE JUDGE TO WHOM THE CASE WAS ASSIGNED

        5.    DISPOSITION (FOR EXAMPLE, WAS THE CASE DISMISSED? WAS IT APPEALED? IS IT STILL PENDING?)

        6.    APPROXIMATE DATE OF THE FILING OF THE LAWSUIT

        7.    APPROXIMATE DATE OF THE DISPOSITION

I. **Hopson v. Ohio General Assembly, 2020-00607**

   **Brief description:**
   **Parties to Civil Action**: Peyton Hopson, Plaintiff and Ohio General Assembly, Defendant.
   **Nature of Action**: Cruel and unusual punishment – retroactive application of sex offender law
   **Court**: Ohio Court of Claims
   **Dismissed**: beyond the statute of limitations

II. **Hopson v. Ohio Department of Rehabilitation and Correction, 2021-00308**

   **Brief description:**
   **Parties to Civil Action**: Peyton Hopson, Plaintiff and Ohio Department of Rehabilitation and Correction
   **Nature of Action**: Deductions from EIP payment for fines and court cost
   **Court**: Ohio Court of Claims
   **Dismissed**: Court lacked jurisdiction

III. **Hopson v. Hunt, 2:20-cv-4751, (September 21, 2021)**

   **Brief description:**
   **Parties to Civil Action**: Peyton Hopson, Plaintiff and Sara Lioi, Defendant.
   **Nature of Action**: 42 U.S.C. : 1983 Prisoner's Civil rights action
   **Court:** United States District Court, Southern District of Ohio, Eastern Division
   **Dismissed**: failure to state a claim upon which relief may be granted.

**PLACE OF PRESENT CONFINEMENT**

A. IS THERE A PRISONER GRIEVANCE PROCEDURE IN THIS INSTITUTION? YES (X) NO ( )

B. DID YOU PRESENT THE FACTS RELATING TO YOUR COMPLAINT IN THIS STATE PRISONER GRIEVANCE PROCEDURE? YES (X) NO ( )

C. IF YOUR ANSWER IS YES:

1. WHAT STEPS DID YOU TAKE?

   First, I filed an informal complaint with the institution.

   Secondly, I appealed the decision to the Ohio Department of Rehabilitation and Correction's Chief Inspector.

2. WHAT WAS THE RESULT?

   On appeal the Chief Inspector omitted to review the issue of this Complaint. See Exhibit E.

D. IF YOUR ANSWER IS NO, EXPLAIN WHY NOT.

E. IF THERE IS NO PRISON GRIEVANCE PROCEDURE IN THIS INSTITUTION, DID YOU COMPLAIN TO PRISON AUTHORITIES? YES ( ) NO ( )

F. IF YOUR ANSWER IS YES:

1. WHAT STEPS DID YOU TAKE?

2. WHAT WAS THE RESULT?

DEFENDANTS:

PLACE THE NAME AND ADDRESS OF EACH DEFENDANT YOU LISTED IN THE CAPTION ON THE FIRST PAGE OF THIS COMPLAINT. THIS FORM IS INVALID UNLESS EACH DEFENDANT APPEARS WITH FULL ADDRESS FOR PROPER SERVICE.

1. MICHELLE BUMGARDNER
   NAMES - FULL NAME PLEASE
   68518 Bannock Rd. S.R. 331
   P.O. Box 540, St. Clairsville, Ohio 43950-0540
   ADDRESS - STREET, CITY, STATE AND ZIP CODE

2. 

3. 

4. 

5. 

6. 

IF THERE ARE ADDITIONAL DEFENDANTS, PLEASE CONTINUE LISTING THEM.

-4-

March 15, 2022, I was assessed by nursing staff for an injury to my right knee. The injury had occurred while trotting to get in line for the commissary. Nursing staff gave me a small quantity of Tylenol and Ibuprofen; an ace bandage; and, one week of medical bottom bunk restriction; and, one week of medical lay-in from work duty in Food Service; and, ordered ex-rays.

By June 9, 2022, before the ex-rays had come back my right knee (the same knee) popped (dislocated) while I was walking the track. I sent a subsequent medical kite complaining that my knee had popped (dislocated), of sharp pains, of swelling and of discomfort. See Exhibit A.

After not having received a response I re-kited Inmate Health Services ("IHS") complaining of the continuing painful swelling of my knee and of the onset of a sciatic nerve condition down my left lower back, buttocks and leg. I described the pain of it all as crippling and excruciatingly painful. I stated for the record that I was suffering pain at a level 10. I requested a cane and a medical lay-in from work. I opted out of requesting another medical bottom bunk restriction. I didn't want to contend with the physical pain from the physical exertion of relocating all of my property to another bunk location.

June 27, 2022, an Audrey Jones responded, "Your x-ray results have come back and ALP will address at follow up appointment scheduled. Continue to take Tylenol and Ibuprofen for pain. Continue wearing ace bandage and applying ice." See Exhibit B.

1 of 11

At the time of seeing Nurse Practitioner Michelle Bumgardner (hereafter: "Bumgardner") my right knee was visibly injured. With the naked eye one could see that the muscles around my knee were contorted and that the knee itself was dislocated. Based on the initial x-rays, without having taken an x-ray subsequent to my complaint of a now dislocated knee, Bumgardner told me it was just arthritis in my knee, gave me another small quantity of Tylenol and Ibprofren; and, a knee sleeve. I again requested the issuance of a cane and a medical lay-in from work, as necessary to relieve the pain of moving about on the knee and to give my knee time to heal properly. Bumgardner denied the request for a cane, and denied the request for a medical lay-in from work.

## DELIBERATE INDIFFERENCE

To state a claim arising from allegedly inadequate medical care under the Eighth Amendment and § 1983, a plaintiff must allege that the defendant was deliberately indifferent to his serious medical needs, meaning that the defendant knew of and disregarded a substantial risk of serious harm to the plaintiff's health. _Spears v. Ruth_, 589 F.3d 249, 254 (6th Cir. 2009) _(citing Estate of Carter v. City of Detroit_, 408 F.3d 305, 311 (6th Cir. 2005) and _Farmer v. Brennan_, 511 U.S. 825, 835-37, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).

## OBJECTIVE STANDARD

For the purpose of satisfying the objective component of this test, the Sixth Circuit has defined a "serious medical need" as "either one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." _Villegas v. Metro. Gov't of Nashville_, 709 F.3d 563, 570 (6th Cir. 2013) (quotation marks and citations omitted).

The mere sight of the contorted leg muscles and of the dislocated knee of my right leg made the necessity for a doctor's attention so obvious that even a lay person would have easily recognized the necessity for a doctor's attention." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 570 (6th Cir. 2013) (quotation marks and citations omitted).

**SUBJECTIVE STANDARD**

The subjective component of a deliberate indifference claim requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer*, 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. To establish the subjective component of this alleged violation, a prisoner must plead facts showing that "prison authorities have denied reasonable requests for medical treatment in the face of an obvious need for such attention where the inmate is thereby exposed to undue suffering or the threat of tangible residual injury." *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976). A defendant's state of mind is sufficiently culpable to satisfy the subjective component of an Eighth Amendment claim when it amounts to a reckless disregard of a substantial risk of serious harm; behavior that is merely negligent will not suffice. *Farmer*, 511 U.S. at 835-36. Consequently, allegations of medical malpractice or negligent diagnosis and treatment fail to state an Eighth Amendment claim of cruel and unusual punishment. See *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional

violation merely because the victim is a prisoner."). Thus, when a prisoner has received some medical attention but disputes the adequacy of that treatment, the federal courts are generally reluctant to second-guess the medical judgments of prison officials and thus to constitutionalize claims which sound in state tort law. *Westlake*, 537 F.2d at 860 n.5. Notwithstanding, the Sixth Circuit has also recognized that "in some cases the medical attention rendered may be so woefully inadequate as to amount to no treatment at all." *Id.*

It is well established that pain can be a "sufficiently serious" medical need for purposes of a deliberate indifference claim. *See Boretti v. Wiscomb*, 930 F.2d 1150, 1154-55 (6th Cir.1991) (reversing grant of summary judgment to defendant who failed to provide pain medication and holding that "a prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering."); *accord Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir.1999) (reversing grant of summary judgment to prison guard who failed to provide pain medication to inmate); *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir.1999) ("[P]rison officials may violate the Eighth Amendment's commands by failing to treat an inmate's pain."); *Logan v. Clarke*, 119 F.3d 647, 649 (8th Cir.1997) (finding that "substantial" pain was a serious medical need).

Bumgardner's opinion that Hopson just had arthritis in his knee was based on the initial x-ray that had been taken of Hopson's right knee before Hopson had complained of the same knee subsequently having popped (dislocated) out of place. See Exhibits A & B. Therefore, the assessment and treatment provided by Bumgardner did not address Hopson's complaint of a dislocated knee.

4 of 11

The medical community has determined that an audible popping sound of the knee is an indication of a dislocated knee. See Exhibit C, Pg.1. Hopson had complained that his knee had popped. See Exhibit A. The medical community standard for examining and treating a dislocated knee is as follows: "A doctor will give a fast-acting painkiller and then push the kneecap back into its normal position. Often it already moves back to its normal position by slowly stretching the leg. Sometimes a special manual technique is used to help.

* This involves lying on your back and relaxing the muscles in your leg so that all the muscles, tendons and ligaments are as loose as possible.

* Then the doctor places their hands around the kneecap, putting their thumbs right on the kneecap. An assistant holds your leg by the ankle.

* While the doctor pushes the kneecap back into correct position, the assistant pulls your leg to extend it.

Once everything is back in place, you wear a special brace or bandage to stabilize the kneecap. It may also help to use crutches at first in order to put less weight on the injured knee. The following is recommended for the first few days after a kneecap dislocation:

* Rest the knee (stand and walk as little as possible, and bending or extending the joint).

* Put up the leg regularly and cool it several times a day for 15 to 20 minutes.

* Take anti-inflammatory painkillers like ibuprofen if you need to.

Surgery is usually considered if this is already the second time your kneecap has been dislocated. It may also be considered if the kneecap is likely to be dislocated again or if there are major cartilage or bone injuries." See Exhibit C, Pg.3.

**Culpable State of Mind**

Bumgardner did not physically examine Hopson's knee. Bumgardner did not make an attempt to push Hopson's knee back into correct position. Bumgardner did not have additional x-ray done subsequent to Hopson's complaint of having popped (dislocated) the knee. Bumgardner denied Hopson's reasonable medical request for the issuance of a cane and denied Hopson's reasonable request for a medical lay-in from work.

Essentially, Bumgardner left Hopson with an unexamined dislocated knee; gave Hopson a knee sleeve and painkillers; and, left Hopson to deal with the severe pain of walking on a dislocated knee without the assistance of a cane to take pressure off the knee; and, left Hopson subjected to the dangers furthering the damage to his knee in the performance of vigorous physical labor on a dislocated knee as it was mandatory he performed his work detail duties in food service working on his feet (dislocated knee) for hours at a time daily. Even if Hopson's knee was not dislocated and Hopson was suffering from some lesser type of knee injury the fact that Bumgardner gave Hopson a knee sleeve and painkillers establishes that Bumgardner was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that she also drew the inference. Hence, Bumgardner's refusal to grant Hopson's reasonable request for a cane and a medical lay-in from work can only be construed as obdurate. See Estelle v. Gamble, 429 U.S. at 105 -106.

As well, Hopson is Hepatitis C ("HCV") positive. HCV and Rheumatic Disease are well known to go hand in hand. The same virus that causes HCV is known to cause infected individuals joint, muscle, and connective tissue (the tissue that supports and binds many other parts of the body) severe problems. See Exhibit D. However, the Ohio Department of

Rehabilitation and Correction ("ODRC") has a blanket policy which denies Hopson curative treatment of HCV based on cost of the treatment. See Exhibit E, Pg.1. Also see *Atkins v. Parker, 972 F.3d 742 (6th Cir.)*, (holding that "the only conceivable reason to withhold treatment from all inmates suffering from chronic hepatitis C is a lack of funding.").

On December 5, 2022, in continued effort to obtain sufficient medical treatment of his knee Hopson attempted to present medical information to Bumgardner from John Hopkins Hospital concerning the correlation between HCV and the bone and muscle damage of his knee. See Exhibit D. Bumgardner responded by becoming so agitated and irate that she went as far as to call out for additional medical staff in an attempt to stage a scene that suggested that Hopson was somehow acting aggressively towards her by presenting medical research refuting her opinion that HCV has nothing to do with the bone and muscle damage of his knee. See Exhibit F..

Bumgardner's avoiding to treat Hopson's dislocated knee was in deliberate effort to avoid paying the cost of treating Hopson's HCV. To have sufficiently treated Hopson's knee would have entailed ODRC having to provide Hopson with curative treatment for his HCV in spite of ODRC's policy to the contrary. For what good would it have served to treat Hopson for rheumatic disease without first curing him of the HCV that causes the rheumatic disease condition? See Exhibit D. So in effort to avoid paying the cost of Hopson's "would be" inevitable treatment for HCV against ODRC policy Bumgardner deliberately refused to adequately treat Hopson's dislocated knee.

Bumgardner's was of a culpable state of mind when omitting to order a second set of x-ray in response to Hopson's subsequent complaint of his knee having popped (dislocated); and, omitting to reset Hopson's dislocated knee; and, refusing to grant Hopson's reasonable request

for a cane and a medical lay-in from work. Bumgardner's treatment of Hopson's dislocated knee was so woefully inadequate as to amount to no treatment at all. Thereby Hopson was exposed to undue suffering and the threat of tangible residual injury from the constant exertion and pressure of walking and working on the dislocated knee. *Westlake*, 537 F.2d at 860 n.5.Id. (6th Cir. 1976).

**IMMUNITY:**

In *Chambers v. Correct Solution*, 2015 U.S. Dist. LEXIS 129254, at 11, the Court held, Construing the complaint liberally in his favor, the plaintiff's allegations that the unnamed nurse practitioner failed to make any effort to alleviate his level 8 pain from a broken toe states a colorable claim of deliberate indifference. *Westlake*, 537 F.2d at 860 n.5. Notwithstanding, the Sixth Circuit has also recognized that "in some cases the medical attention rendered may be so woefully inadequate as to amount to no treatment at all." *Id.*

The knee sleeve and the pain relievers proscribed by Bumgardner served Hopson little, if any good, in the face of denying his reasonable request for the issuance of a cane and the denial of his reasonable request for a medical lay-in from work. The pain caused to Hopson from the exertion and pressures of walking on an injured knee without the assistance of a cane and working while standing on an injured knee for hours daily would have been recognizable to even a lay person. Hence, Bumgardner's denial of Hopson's reasonable requests for a cane and a medical lay-in from work rendered the medical attention of Bumgardner so woefully inadequate as to amount to no treatment at all. On appeal ODRC Chief Inspector made no claims of Bumgardner having acted in accordance with ODRC policies. Hence, Bumgardner acted in her own personal capacity and is therefore not entitled to immunity. See Exhibit E.

**INJURIES:**

**1) Pain and Discomfort** – Due to Bumgardner's failure to reset Hopson's knee; and, failure to grant Hopson's reasonable requests for the issuance of a cane and a medical lay-in from work to keep pressure off of his knee Hopson was put to undue suffering from being forced to resume regular daily activities on a freshly dislocated knee. Hopson filed his medical complaint June 9, 2022. To date, Hopson's knee still has not received sufficient medical attention and continues to cause pain and discomfort. After the December, 2022, incident Hopson has been fearful of returning to IHS for medical treatment. See Exhibit F.

**2) Permanent Disfigurement** – Due to Bumgardner's failure to reset Hopson's dislocated knee in a timely fashion Hopson's knee joint has not properly healed. Compounded by the constant exertion and pressures of walking and working on a dislocated knee Hopson's right leg muscles and knee are now permanently contorted. See Exhibit G.

**3) Permanent Limping** – Due to Bumgardner's failure to reset Hopson's dislocated knee in a timely fashion Hopson's knee joint has not properly healed. Hopson's right leg muscles and knee are permanently contorted. The permanent contorted muscles and knee of Hopson's right leg causes Hopson to now walk with a reoccurring limping of the right leg. See Exhibit G.

**INJUNCTIVE RELIEF SOUGHT:**

**1) Medical Examination by a Rheumatology Provider** – Hopson is Hepatitis C ("HCV") positive. HCV and Rheumatic Disease are well known to go hand in hand. The HCV virus is known to cause infected individuals joint, muscle, and connective tissue (the tissue that supports and binds many other parts of the body) severe problems. See Exhibit D. Rheumatic Disease condition requires the specialized attention of a rheumatology provider. See Exhibit D, Pg.3.

**MONETARY RELIEF SOUGHT:**

**1) Pain and Suffering $10,000** – Due to Bumgardner's failure to reset Hopson's knee; and, denial of Hopson's reasonable requests for the issuance of a cane and a medical lay-in from work to keep pressure off of his knee Hopson was subjected to undue suffering and the threat of tangible residual injury from the exertion of walking and working on a dislocated knee.

**2) Permanent Disfigurement $25,000** – Due to Bumgardner's failure to reset Hopson's dislocated knee; and, denial of Hopson's reasonable request for the issuance of a cane and a medical lay-in from work to keep pressure off of his dislocated knee Hopson's right leg and knee are now permanently disfigured i.e., the muscles and the knee of Hopson's right leg are contorted from not being allotted sufficient time and provisions to heal properly. See Exhibit G.

**3) Loss of Enjoyment of Life $25,000** – Due to Bumgardner's failure to reset Hopson's dislocated knee; and, denial of Hopson's reasonable request for the issuance of a cane and a medical lay-in from work to keep the pressure off of his dislocated knee Hopson's right leg and knee are now permanently disfigured i.e., the muscles and the knee of Hopson's right leg are contorted from not being allotted sufficient conditions and time to heal properly. As a result of the contorted muscles and knee of Hopson's right leg his mobility is now impaired. Hopson has been an extremely athletic individual throughout his life training and competing in martial arts, powerlifting competitions and body building. Now Hopson is no longer able to perform the activities that are required to maintain the peek health required for such training such as running and jumping rope to burn fat and shape the leg muscles. Hopson's physique and athleticism has played a central role in his personal identity. Therefore, the injury caused by Bumgardner's woefully inadequate treatment of Hopson's knee not only debilitated his mobility, but deprived

him of his fullness and enjoyment of life. See Exhibit H.

**PERSONAL CAPACITY:**

Hopson brings this 42 U.S.C. 1983 Prisoner Civil Right Action against Michelle Bumgardner in her personal capacity. Plaintiff' allegations that nurse practitioner Michelle Bumgardner rendered medical attention so woefully inadequate that it amounted to no treatment at all states a colorable claim of deliberate indifference. See *Chambers v. Correct Solution*, 2015 U.S. Dist. LEXIS 129254, at 11. Also see *Westlake*, 537 F.2d at 860 n.5.

**EXHAUSTION OF PRISON ADMINISTRATIVE REMEDIES :**

This Complaint has undergone the complete ODRC grievance process. Belmont Correctional Institution combined the issue of this Complaint "woefully inadequate medical attention of Plaintiff's knee injury" with Plaintiff's grievance for failure to treat Plaintiff's HCV condition. On appeal the Chief Inspector responded to the HCV issue. However, the Chief Inspector omitted to address the issue at the core of this Complaint "woefully inadequate medical attention of Plaintiff's knee injury". See Exhibit E.

**JURY DEMAND STATEMENT**

Plaintiff demands that this action is tried before a jury.

SIGNED THIS 7th DAY OF March, 2023.

Peyton Hopson, Pro Se
Inmate No. #662-444
P.O. Box 540
St. Clairsville, Ohio 43950